IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RODRIGO VASQUEZ HERNANDEZ,

        Petitioner,

v.

M.S. EVANS,

        Respondent.

NO. C08-2892 TEH

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Rodrigo Vasquez Hernandez is currently incarcerated by the California Department of Corrections and Rehabilitation at Salinas Valley State Prison in Soledad, California. On his own behalf and without counsel, Petitioner filed a petition for a writ of habeas corpus before this Court, pursuant to 28 U.S.C. § 2254, on June 9, 2008. Counsel for Petitioner subsequently filed a notice of appearance on October 19, 2008. After conducting an initial review of the petition, the Court ordered Respondent M.S. Evans to show cause as to why the petition should not be granted. Respondent filed an answer on May 15, 2009, and Petitioner filed a traverse on June 15, 2009. After carefully reviewing the parties' written arguments, the record, and governing law, the Court now DENIES the petition for the reasons set forth below.

**I.    BACKGROUND**

On June 30, 2004, a jury in the Superior Court of Santa Clara County convicted Petitioner of five counts: (1) rape, (2) penetration with a foreign object, and (3) forcible oral copulation, all with a minor under the age of fourteen and more than ten years younger than defendant; (4) exhibiting harmful material to a minor; and (5) inducing a minor's involvement in modeling, posing, or performing sexual conduct. On September 9, 2004, the

court sentenced Petitioner to three consecutive terms of fifteen years to life in prison for the first three counts, followed by consecutive terms of two years for the fourth count and eight months for the fifth count.

Petitioner timely appealed his conviction to the California Court of Appeal for the Sixth District.  On June 14, 2006, the appellate court issued an unpublished opinion affirming the conviction and sentence, except for imposing a stay on the two-year consecutive sentence for the fourth count.  The California Supreme Court denied review on August 23, 2006, and the United States Supreme Court denied certiorari on March 26, 2007.  Petitioner sought habeas relief before the California Supreme Court on October 23, 2007, and the petition was summarily denied on April 16, 2008.  The grounds raised in the petition filed before this Court were among those raised in both Petitioner's direct appeal and his state habeas petition.

This Court has subject matter jurisdiction under 28 U.S.C. § 2254, and venue is proper in this district under 28 U.S.C. § 2241(d).  The parties do not dispute that Petitioner has exhausted his state remedies as to all of the claims presented in this petition, nor do they dispute the timeliness of the petition.

The facts of the underlying convictions, as found by the California Court of Appeal, are as follows:

> At the time of trial defendant was 56 years old and Korina, the alleged victim, was 14 years old.  Defendant did not testify in his defense.  Korina testified that between the ages of five and seven she sometimes visited her paternal grandmother, Teri, on weekends and on weekdays after school.  Teri was then dating defendant, who would sometimes pick up Korina when school got out between 2:00 and 3:00 p.m.  After picking her up he would typically take her to Teri's house.  However he sometimes took her to his house, and each time he did, unless someone else was there, something would happen.  Korina's description of these occurrences follows.
>
> On one occasion in second grade, defendant took Korina to his house after attending a school field trip as a chaperone.  He led her by the hand into his bedroom, which she was able to describe at trial.  He sat her on the edge of the bed and touched her chest over her shirt, "[g]rabbing it and rubbing."  She asked him what he was doing, but he did not answer.  On another occasion, Korina and defendant went into his bedroom, where he told her to disrobe, disrobed himself, took her hand, and masturbated

2

himself with it. She tried to pull back but he was holding her wrist.

On a third occasion, defendant had Korina lie on the bed, removed her pants and put his mouth and tongue on and in her vagina. She protested, but he did not respond in any way. She tried to close her legs, but he was holding them. He touched her chest under her shirt but over her training bra. He told her she was "feeling up nice" [which the appellate court believed was likely an incorrect transcription of "filling out nice"]. She did not tell anyone about this incident. She was afraid that if she told her mother, she would be mad at her. At some point defendant told her that she couldn't tell anybody, or she would get in trouble and hurt her family. He also said that he would get mad at her and hurt her. She believed him.

On a fourth occasion, Korina testified, defendant had her take off her clothes and lie down on his bed. He lay on top of her, forced her legs apart against resistance, and placed his penis against her outer vagina, disregarding her repeated protests. Then he stood up and forcibly penetrated her mouth, overcoming her attempts to remove his hands from her head and to pull her head back.

On a fifth occasion, again in defendant's bedroom, he said he had found some videos and wanted to see what was on them. When he played them, they depicted men and women having sex. Korina watched for a while and then turned her head. Defendant told her the acts depicted in the videos were "what he wanted [her] to do." She did not reply. He then told her to take her clothes off, and she complied. Defendant took off his pants, lay on top of her, and penetrated her vagina with his penis. It did not feel right; it hurt. She was crying, telling him no, and trying to move away from him. Throughout the act he held her arms down with his hands. She could hear people groaning in the video. Defendant told her she was going a good job. After a few minutes it ended, and defendant went into the bathroom. On a sixth occasion defendant again penetrated Korina's vagina with both his fingers and his penis.

On a seventh occasion defendant had Korina disrobe and pose while he took pictures of her. Among other poses, he had her open her legs so he could photograph her vagina. She did not want him to take these pictures but complied with his instructions because she was scared. He shredded three photos in which her face was visible but put the one of her vagina in his wallet. On another occasion he ejaculated between her breasts and then "took his hand and he moved it around my breasts." On one or more occasions, he masturbated to climax in her presence.

On several occasions defendant took Korina to his house when he was supposed to be taking her to the store. Sometimes while they were in the car he would reach over and put his hand between her legs. If she was wearing shorts he would sometimes reach under them and touch her vagina, sometimes penetrating it.

3

In total, defendant digitally penetrated Korina more than five times. She never wanted him to do that. He also caused her to touch his penis with her mouth more than five times. She never wanted to do this, and each time he held her head. He also put his penis in her vagina more than five times. On each occasion she tried but failed to stop him. He showed her videos on about four occasions; she could remember two or three different videos.

Korina testified that the last "sexual[] assault[]" was between fourth and fifth grade. However she also testified that after defendant and Teri broke up, which was probably while Korina was in fifth grade, defendant took her to lunch about three times. They would go to a hamburger chain or another restaurant and then go to his house, where he would "sexually assault [her]."

The first person she told about what defendant had done to her was a friend with whom she attended after-school day care, probably in fifth grade. She hadn't told anybody before then because she was scared of defendant. While they were walking out to the playground, Korina told Kiana "everything." She told Kiana not to tell anybody else because she was afraid of what defendant was going to do. However, the conversation was overheard by Jessie, who came over to Kiana and Korina, who then told her what they had been talking about. Also in fifth grade, Korina told her friend Edward, who told her she ought to tell someone, and said "that wasn't right."

In sixth grade her counselor brought up the subject with her, apparently having learned of it from a teacher one of whose students mentioned it to her after a discussion of sexual harassment. This was the first adult she told. She felt scared that defendant was going to hurt someone because she had told. She was also ashamed for not telling anyone, and because it had happened. Her mother had asked her in the past whether anybody had done anything to her, and Korina had told her "no, nobody did anything."

After acknowledging to the counselor, what had happened Korina told her mother, who took her to the police station. At some point she made a telephone call to defendant from the police station with Officer Serrano listening in and recording the call. The officer told her to say some untrue things to defendant of a sexual nature. A recording of the call was played for the jury. Although nothing in the call appears to have been conclusive of guilt or innocence, the jury could reasonably infer that defendant failed to assertively deny Korina's accusations of misconduct. Also, although Korina told defendant that she was having suicidal thoughts and bad dreams, and was acting out sexually with a male friend, defendant made no apparent effort to contact a responsible adult. Instead he tried to persuade her that her feelings and conduct were normal, and that she should meet him "person to person" to discuss the matter further. He also expressed concern that she might be recording the conversation, or that others might be eavesdropping on it.

4

> Korina's grandmother Teri testified among other things that defendant took care of Korina at least three times at his house. On one of these occasions, when Korina was perhaps six, Teri arrived at defendant's house in the early evening, after she got off work. Korina was playing with defendant's niece, who was a few months her senior. They were "playing dress-up," "wearing kind of nightgowns," and jumping on defendant's bed. The nightgowns were adult sized, "lingerie type" garments. Teri was upset by this spectacle, and found it "very strange" that "they were wearing these nightgowns and they were acting floozie kind of like acting silly." She asked defendant what was going on. He replied "[t]hat the girls said they were playing hookers."
>
> As described more fully [below], the prosecution introduced testimony from two witnesses to the effect that defendant had sexually victimized them while they were very young. The jury also learned that when police officers executed a search warrant on defendant's home, they found in his bedroom two adult videotapes entitled "Rock that Young Ass" and "Old Men Younger Chicks." No photographs of Korina were found.

Resp. Ex. D at AGO1-AGO3 (*People v. Hernandez*, Cal. Ct. App. decision, Case No. H027955 (June 14, 2006)) (footnotes and citations omitted).

The two witnesses mentioned above were sisters, Jerri and Kimberly Doe, who testified "about sex acts they said defendant had perpetrated against them in the 1970's, while they were minors." *Id.* at AGO4.

> Jerri testified that she met defendant in 1971, when he was the mail carrier on her street. She was 15 and he, unbeknownst to her, was 23. A couple of weeks after they met, he invited her on a date and, with her parents' consent, she accepted. After attending a drive-in movie, Jerri and defendant ended up at Alum Rock Park. Defendant started kissing her and then forced her to have sexual intercourse with him although she kept saying no and tried to push him off her.
>
> Jerri and defendant continued to see each other, and before long defendant was talking about marriage. Eventually they became engaged. Jerri's mother had told her that if a girl had premarital sex she should be prepared to marry the male she had it with because no one else would want her. During their engagement defendant would sometimes stay overnight in a room in Jerri's parents' house. Jerri's four sisters also lived there. Sometime during this period their father apparently left the home.
>
> In 1974 Jerri married defendant and had two children with him. They separated in 1988 and ultimately went through an unfriendly divorce.

5

> Jerri's youngest sister, Kimberly, testified that she was around seven to nine years old when defendant lived with her family, before his marriage to Jerri. At defendant's suggestion, Kimberly would sometimes watch TV with him in his room. On one occasion he told her he wanted to teach her "how to do a big kiss, which was an open mouth kiss." He did so, using his tongue. This occurred several times. He would also sometimes put his hand inside her pants and underwear, rubbing her bottom and vagina. He partly penetrated her vagina with a finger. She was seven or eight at this time.
>
> After defendant and Jerri had their own house, defendant would sometimes strip to his underwear and get Kimberly to walk on his back; he would then place her hand on his penis. The last time he touched her in a sexual way was when she was 10 or 11 and babysitting her nephews (i.e., his sons).
>
> Kimberly also testified about a phone conversation she had with defendant around the time of his divorce from Jerri. Defendant said something about Jerri, which Kimberly no longer remembered, though she remembered her reply: "[H]ow can you say that after what you've done, what you did to me, and he said what are you talking about, and I said you know exactly what I'm talking about and I hung up. And I have not seen him or talked to him since."

*Id.*

The appellate court found that the Jerri's testimony should have been prohibited as substantially more prejudicial than probative, but that admitting Kimberly's testimony was not an abuse of discretion. *Id.* at AGO7-AGO9. The court subsequently found admission of Jerri's testimony, as well as the allegations of prosecutorial misconduct at issue in this petition and discussed below, to be harmless error. *Id.* at AGO13-AGO15.

## II. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court cannot grant a writ of habeas corpus with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

6

        (2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C § 2254(d).

A state court's decision is "contrary to" clearly established Supreme Court law if it fails to apply the correct controlling authority or if it applies the controlling authority to a case involving materially indistinguishable facts but reaches a different result. *Williams v. Taylor*, 529 U.S. 362, 413-14 (2000). A decision is an "unreasonable application" of Supreme Court law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 414. Holdings of the Supreme Court at the time of the state court decision are the only definitive source of clearly established federal law under AEDPA. *Id.* at 412. "While circuit law may be 'persuasive authority' for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied." *Clark v. Murphy*, 331 F.3d 1062, 1070 (9th Cir. 2003) (citation omitted).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citation omitted). Moreover, in conducting its analysis, the federal court must presume the correctness of the state court's factual findings, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C § 2254(e)(1).

## III. DISCUSSION

The only remaining claims in this habeas petition concern two allegations of prosecutorial misconduct: first, that the prosecutor unlawfully commented on Petitioner's failure to testify at trial in violation of *Griffin v. California*, 380 U.S. 609 (1965), and, second, that the prosecutor misstated the law concerning the testimony by Jerri and

7

Kimberly. Petitioner raised two other claims in his petition but concedes in his traverse that his claims relating to *Cunningham v. California*, 549 U.S. 270 (2007), and the admission of evidence of prior bad acts, including testimony by Jerri and Kimberly, "can not be credibly advanced or raised in federal court." Traverse at 6.

### A. *Griffin* Claim

During closing argument at trial, the prosecutor, when recounting the testimony of Teri, Korina's grandmother, argued that "her description of [defendant's] house matches Korina's description including his bedroom. [¶] Now, other than to assault this child, why is she [presumably, Korina] in his bedroom? What explanation have you heard for that?" Resp. Ex. B at 608:20-24 (Rep. Tr.). Petitioner argues here, as he did at trial and on appeal, that the prosecutor's second question – "What explanation have you heard for that?" – was an impermissible comment on Petitioner's failure to testify at trial.

In *Griffin v. California*, 380 U.S. at 615, the Supreme Court held that "the Fifth Amendment, in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." While the prosecution may permissibly "call attention to the defendant's failure to present exculpatory evidence more generally," it "may not draw attention to a defendant's silence." *United States v. Mayans*, 17 F.3d 1174, 1185 (9th Cir. 1994). A prosecutor's comment is "impermissible if it is manifestly intended to call attention to the defendant's failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify." *Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987) (citations omitted). However, such commentary by the prosecution "mandates reversal only if: (1) the commentary is extensive; (2) an inference of guilt from silence is stressed to the jury as a basis for the conviction; and (3) where there is evidence that could have supported acquittal." *Jeffries v. Blodgett*, 5 F.3d 1180, 1192 (9th Cir. 1993) (citation omitted).

The state appellate court applied the correct law in ruling on Petitioner's claim and found as follows:

8

> Defendant's argument presupposes that the absence of an alternative explanation for Korina's knowledge of his bedroom could only have been cured by defendant's own testimony. This supposition is incorrect, as was the premise for the prosecutor's argument. Both parties have inexplicably overlooked the testimony of Teri, Korina's grandmother and defendant's then-girlfriend, that *she* had seen Korina and defendant's niece "jumping on the bed" in defendant's bedroom. The overall effect of this testimony may not have been favorable to the defense, because the girls were "playing dress-up" and defendant himself told Teri that they were "playing hookers," but the testimony squarely placed Korina in defendant's bedroom quite independently of her own testimony, and furnished an alternative explanation for her knowledge of the bedroom.
>
> It follows that in noting (inaccurately) the absence of an alternative explanation for Korina's familiarity with that room, the prosecutor did not draw attention to defendant's failure to testify. Teri's testimony supplied an alternative explanation, not culpable in itself, for the point to which the prosecutor referred. The argument therefore does not constitute an implied comment on defendant's silence. Given its factual inaccuracy, the effect of the prosecutor's argument on the jury's thought processes was presumably minuscule, i.e., that the jury, knowing there was an alternative explanation for Korina's knowledge, dismissed the prosecutor's contrary supposition, and the argument based on it. However the jury viewed it, we fail to see how the jury could have migrated from this mistaken argument to an adverse inference about defendant's silence.
>
> We conclude that no *Griffin* error occurred.

Resp. Ex. D at AGO10-AGO11.

Having reviewed the trial record, this Court concludes that the state court's ruling was not contrary to clearly established federal law, did not unreasonably apply the law to the facts, and was not based on an unreasonable determination of the facts. The prosecutor did not comment specifically on Petitioner's failure to testify, nor were her comments such that the jury would "naturally and necessarily take it to be a comment on the failure to testify." *Lincoln*, 807 F.2d at 809. This Court therefore agrees that no *Griffin* error occurred. Moreover, even if the prosecutor's comment did violate *Griffin*, habeas relief would be unwarranted because "the comment was a single, isolated incident rather than an extensive tactic by the prosecution," and the trial record contains overwhelming evidence of guilt. *Jeffries*, 5 F.3d at 1192; *see also Hovey v. Ayers*, 458 F.3d 892, 912 (9th Cir. 2006) (denying habeas relief where "the prosecutor's inappropriate comments were isolated statements, and

9

1 they were minimal in comparison with the weight of the evidence presented against [the
2 defendant]").

### B.     Misstatement of Law

Petitioner's second claim concerns the following statements made by the prosecutor during closing argument, which Petitioner contends violated his right to due process:

> The other thing is in order for you to find the defendant not guilty, you would have to believe that Korina lied. You would have to believe that Jerri lied. You would have to believe that Kimberly lied. These three women who are unrelated to each other. Kimberly and Jerri do not know Korina.

Resp. Ex. B at 677:8-13. Respondent does not dispute that these comments misstated the law because Petitioner was on trial only for acts committed against Korina and the jury could have acquitted Petitioner even if it believed that Jerri and Kimberly had not lied.

Prosecutorial misconduct violates a defendant's due process rights when it so infects the trial as to render the proceedings fundamentally unfair. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Factors to consider when weighing a claim of prosecutorial misconduct include: "(1) whether the prosecutor's comments manipulated or misstated the evidence; (2) whether the trial court gave a curative instruction; and (3) the weight of the evidence against the accused." *Tan v. Runnels*, 413 F.3d 1101, 1115 (9th Cir. 2005) (citing *Darden*, 477 U.S. at 181-82). Habeas relief is warranted only if the error at issue "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993) (citation omitted). Petitioner is "not entitled to habeas relief based on trial error unless [he] can establish that it resulted in actual prejudice." *Id.* at 637 (internal quotation marks and citation omitted).

Petitioner cannot satisfy this standard here. As the state appellate court correctly concluded:

> The critical question at trial was the credibility of Korina's testimony concerning defendant's repeated sexual acts against her. If the jury found that testimony convincing beyond a reasonable doubt, it would have convicted defendant whether or not it learned of the matters described by Jerri, and whether or not it was exposed to the prosecutor's fallacious linking of Korina's credibility to that of Jerri and Kimberly. It appears highly likely

10

> that neither of these errors [the misstatement of the law and the alleged *Griffin* error] contributed to the verdict, because the jury would have believed Korina's testimony without them.

Resp. Ex. D at AGO13. The state court also did not unreasonably determine the facts when it described other evidence corroborating Korina's testimony. *Id.* at AG013-AGO15.

Moreover, Petitioner does not challenge the correctness of the trial court's instructions to the jury, including the following:

> Evidence has been introduced for the purpose of showing that the defendant engaged in sexual offenses on one or more occasions other than that charged in this case. . . .
>
> If you find that the defendant committed a prior sexual offense you may but are not required to infer that the defendant had a disposition to commit sexual offenses. If you find that the defendant had this disposition, you may but are not required to infer that he was likely to commit and did commit the crimes of which he is accused. However, if you find by a preponderance of the evidence that the defendant committed prior sexual offenses, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged crimes. If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider along with all other evidence in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crimes.
>
> Unless you are otherwise instructed, you must not consider this evidence for any other purpose.

Resp. Ex. B at 563:11-564:9. The trial court also instructed the jury to

> apply the law that I state to you to the facts as you determine them, and in this way arrive at your verdict. You must accept and follow the law as I state it to you regardless of whether you agree with the law. If anything concerning the law said by the attorneys in their argument or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions.

*Id.* at 554:20-27.

This Court "presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985). As the Supreme Court explained:

11

> Cases may arise in which the risk of prejudice inhering in material put before the jury may be so great that even a limiting instruction will not adequately protect a criminal defendant's constitutional rights. Absent such extraordinary situations, however, we adhere to the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions.

*Id.* (citations omitted).  No such extraordinary circumstances are present in this case.

In short, although Respondent admits that the prosecutor misstated the law during her closing argument to the jury, such error was not prejudicial.  Petitioner has failed to demonstrate that the state court's ruling was contrary to *Darden* or other clearly established federal law, nor has Petitioner shown that the ruling was an unreasonable application of such law or based on an unreasonable determination of the facts.

## IV. CONCLUSION

For all of the reasons discussed above, Petitioner has failed to show that he is entitled to habeas relief in this case.  Accordingly, with good cause appearing, the petition for a writ of habeas corpus is DENIED.  The Clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated: 08/03/09

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT